IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A BLACK SAMSUNG FLIP PHONE, MEID A00000477BFE5B ("DEVICE 1"), A GOLD LG PHONE, IMSI 310260477554622 ("DEVICE 2"), A BLACK ALCATEL ONETOUCH, ESN 270113185015418346 ("DEVICE 3"), CURRENTLY LOCATED AT 5751 UPTAIN ROAD, SUITE 417, CHATTANOOGA, TENNESSEE | Case No.1:19-mj-_65_<br>1:19-mj-66<br>1:19-mj-67 |

## AFFIDAVIT IN SUPPORT OF APPLICATIONS UNDER RULE 41 FOR WARRANTS TO SEARCH AND SEIZE

I, Andrew E. Bergren, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an applications under Rule 41 of the Federal Rules of Criminal Procedure for search warrants authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Drug Enforcement Administration ("DEA"), United States Department of Justice. I have been so employed for the past 21 years. In connection with my official DEA duties, I investigate criminal violations of the federal narcotics laws, including but not limited to, Title 21, United States Code, Sections 841, 843, and 846. I have also been involved in various types of electronic surveillance, the debriefing of defendants, witnesses, informants, and others who have knowledge of narcotics trafficking and of the laundering and concealing of proceeds of drug trafficking, for the past 18 years. I have received specialized training in the enforcement of laws concerning the activities of narcotics traffickers, including

Page 1 of 17

four months of DEA basic training in Quantico, Virginia as well as periodic refresher training offered by DEA. I am currently assigned to the Chattanooga Resident Office. My current assignment involves the investigation of high-level drug trafficking organizations in Tennessee, Georgia and elsewhere. Prior to my employment with DEA, I was employed as a Peachtree City Police Officer for approximately 4 years in Peachtree City, Georgia. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

1. The property to be searched is a black Samsung flip cellular phone (TT#1/423-680-0530), MEID A00000477BFE5B, hereinafter referred to as "DEVICE 1;" a gold colored LG smart phone (TT#4/423-708-0796), IMSI 310260477554622, hereinafter referred to as "DEVICE 2," and a black colored Alcatel Onetouch, ESN 270113185015418346 (423-504-7384), hereinafter referred to as "DEVICE 3." DEVICE 1, DEVICE 2, and DEVICE 3, hereinafter "Target DEVICES" are currently in DEA's possession and are being stored as evidence at the Chattanooga Resident Office.

2. The applied-for warrants would authorize the forensic examination of Target DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

3. Since approximately 2014, the DEA, ATF, and Chattanooga Police Department, and other federal, state, and local law enforcement agencies have been involved in an investigation involving Jerriod SIVELS and Jamaal PARKER. Through this investigation, Jerriod SIVELS and Jamaal PARKER were identified as significant distributors of cocaine and

Page 2 of 17

marijuana in Tennessee. As detailed below, Nathaniel WILKINS was identified as Jerriod SIVELS' and Jamaal PARKER's cocaine source of supply. In a separate investigation conducted by Atlanta DEA beginning in approximately April 2018, WILKINS was identified as a significant distributor of cocaine in the metro Atlanta, Georgia, area.

4. On January 8, 2019, orders to intercept the wire and electronic communications of Jerriod SIVELS over two phones, DEVICE 1 and 615-491-2638 (hereinafter referred to as TARGET TELEPHONE #2), were signed by the Honorable Judge Harry S. Mattice, Jr., United States District Judge, Eastern District of Tennessee. On January 18, 2019, the Honorable Judge Harry S. Mattice, Jr., signed another order authorizing the interception of DEVICE 2, also utilized by Jerriod SIVELS. Interception of communications on DEVICE 2 ceased on February 15, 2019. On February 6, 2019, the Honorable Judge Harry S. Mattice, Jr., signed orders authorizing the continued interception of DEVICE 1 and TARGET TELEPHONE #2. Interception of communications on DEVICE 1 and TARGET TELEPHONE #2 ceased on March 4, 2019.

5. On February 19, 2019, an order to intercept the wire communications of Jamaal PARKER over 423-383-6915 (hereinafter referred to as TARGET TELEPHONE #3) was signed by the Honorable Judge Harry S. Mattice, Jr., United States District Judge, Eastern District of Tennessee. Interception of communications on TARGET TELEPHONE #3 ceased on March 4, 2019.

**Probable Cause Relating to DEVICE 1**

6. On February 15, 2019, at approximately 11:18 p.m., TARGET TELEPHONE #2 received an incoming telephone call from telephone number 470-390-2720, utilized by Jerriod SIVELS' cocaine source of supply, later identified as Nathaniel WILKINS. During the call,

Page 3 of 17

Jerriod SIVELS stated, "I'll be down in the morning." WILKINS replied, "Alright." Your Affiant believes that during this call, Jerriod SIVELS contacted WILKINS and related that he would travel to Atlanta, Georgia the following day to obtain a new supply of cocaine.

7. On February 16, 2019, at approximately 9:44 a.m., Jerriod SIVELS, utilizing DEVICE 1, made an outgoing telephone call to Anthony POINDEXTER. During their conversation, POINDEXTER asked Jerriod SIVELS if he was just getting up and Jerriod SIVELS said "yeah." POINDEXTER then stated, "Waiting on you, whenever you ready." Jerriod SIVELS then told POINDEXTER he would call him back "in a second."

8. At approximately 10:30 a.m., surveillance was established in the area of 3505/3506 Hoyt Street and 201 #B, N. Lovell Avenue, Chattanooga, Tennessee by members of the DEA Chattanooga Resident Office and Hamilton County Sheriff's Office. At approximately 11:10 a.m., camera surveillance showed Jerriod SIVELS leaving the residence on Hoyt Street. Jerriod SIVELS was observed driving his white Infiniti Q50. Surveillance units in the area followed Jerriod SIVELS at this point. At approximately 11:27 a.m., DEVICE 1 made an outgoing telephone call to POINDEXTER. During the call, Jerriod SIVELS and POINDEXTER talked about Jamaal PARKER. At one point, Jerriod SIVELS stated that he was "going with or without his ass today buddy," referring to Jamaal PARKER. POINDEXTER responded by stating, "You better know it." Jerriod SIVELS then asked POINDEXTER what was going on and POINDEXTER stated, "Waiting on you." Jerriod SIVELS then told POINDEXTER that he would call him back in twenty to thirty minutes and stated, "I'll be ready. I'm ready but I'm going to touch basis with this nigga real fast," again referring to Jamaal PARKER. At approximately 11:34 a.m., surveillance observed Jerriod SIVELS arrive at the Carriage Parc Apartment complex located at 1346 Gunbarrel Road, Chattanooga, Tennessee. Jerriod SIVELS

parked in front of building 2, which contains units 215-238. Jamaal PARKER was known to reside at 228 Carriage Parc, Chattanooga, Tennessee. At that same time, TARGET TELEPHONE #2 made an outgoing telephone call to PARKER. During the call, SIVELS told PARKER to open the door.

9. At approximately 12:21 p.m., TARGET TELEPHONE #2 received an incoming call from telephone number (678) 381-6364, utilized by an unknown male subsequently identified as WILKINS. During the call, Jerriod SIVELS related that he was walking out the door.

10. At approximately 12:35 p.m., Jamaal PARKER and Jerriod SIVELS were observed leaving the apartments and surveillance was maintained on them. Jamaal PARKER was driving a black colored Chevrolet Silverado bearing Tennessee license plate 5G22P4 and Jerriod SIVELS was driving his vehicle. Surveillance was maintained on Jamaal PARKER and Jerriod SIVELS. At approximately 12:51 p.m., surveillance observed Jamaal PARKER and Jerriod SIVELS at 207 Gillespie Terrace, Chattanooga, Tennessee, the known residence of Jerriod SIVELS.

11. At approximately 1:07 p.m., DEVICE 1 received an incoming telephone call from POINDEXTER. During the call, Jerriod SIVELS asked, "What's happening?" and Jerriod SIVELS responded, "Shit fixin to pull up on ya." At approximately 2:17 p.m., pole camera surveillance observed Jamaal PARKER's Chevy Silverado truck arrive at 3505 Hoyt Street. At approximately 2:32 p.m., pole camera surveillance observed Jerriod SIVELS opening the passenger side of PARKER's truck. TFO Thompson was monitoring the pole camera at Hoyt Street and subsequently observed Jamaal PARKER, Jerriod SIVELS, and two other black males load a dog crate into the rear of PARKER's truck.

12. At approximately 2:36 p.m., Jamaal PARKER's truck was observed leaving 3505 Hoyt Street by pole camera and physical surveillance. Surveillance was maintained on Jamaal PARKER's truck. At approximately 2:57 p.m., DEVICE 1 made an outgoing telephone call to POINDEXTER. During the call, Jerriod SIVELS stated, "I'm outside." At this time, surveillance observed Jamaal PARKER's truck parked at POINDEXTER's residence. At approximately 3:00 p.m., surveillance observed POINDEXTER exit his residence and go to his car. At approximately 3:02 p.m., surveillance units observed Jamaal PARKER and Jerriod SIVELS depart POINDEXTER's residence in Jamaal PARKER's truck. At that same time, POINDEXTER departed the residence in his Hyundai vehicle. At approximately 3:15 p.m., surveillance following Jamaal PARKER's vehicle observed the truck to travel on Interstate 24 and then to southbound Interstate 75.

13. At approximately 3:17 p.m., TARGET TELEPHONE #2 received an incoming telephone call telephone number (423) 505-9022, utilized by POINDEXTER. During the call, POINDEXTER stated, "I'm right here at the Mapco man." Jerriod SIVELS replied, "We done jumped on, trying to get to Atlanta." POINDEXTER then stated, "Had to get some gas" and Jerriod SIVELS responded, "You got some gas already?" POINDEXTER then stated, "Yeah." At approximately 3:20 p.m., surveillance following POINDEXTER observed POINDEXTER traveling southbound on Interstate 75. Surveillance was maintained on both Jamaal PARKER's and POINDEXTER's vehicles.

14. At approximately 4:16 p.m., agents with DEA Atlanta joined DEA Chattanooga agents in the moving surveillance of POINDEXTER and PARKER. At approximately 4:36 p.m., Jamaal PARKER's vehicle was observed exiting Interstate 285 at Exit 12. At approximately 4:44 p.m., surveillance observed Jamaal PARKER's vehicle park at 838 Mildred

Place NW, Atlanta, Georgia. At approximately 4:45 p.m., TARGET TELEPHONE #2 received an incoming telephone call from POINDEXTER. During the call, POINDEXTER stated, "I'm on South Cobb." Jerriod SIVELS replied, "Alright, alright, we here." POINDEXTER then stated, "I know but I need the address" and Jerriod SIVELS replied, "Alright." At this same time, surveillance observed POINDEXTER exit Interstate 285 at Exit 15 onto South Cobb Parkway. At approximately 4:54 p.m., surveillance of POINDEXTER was terminated as he neared Mildred Place NW. At approximately 4:55 p.m., previously-installed court-ordered vehicle tracking units on Jamaal PARKER's and POINDEXTER's vehicles indicated that they were at 838 Mildred Place NW, Atlanta, Georgia.

15. At approximately 5:18 p.m., the vehicle tracking devices indicated that both Jamaal PARKER and POINDEXTER's vehicles were traveling on Mildred Place NW towards Hollywood Boulevard. Surveillance was subsequently established on both vehicles. At approximately 5:31 p.m., surveillance observed POINDEXTER travel to Interstate 285. Surveillance was maintained on POINDEXTER and surveillance of Jamaal PARKER and Jerriod SIVELS was terminated. POINDEXTER was later followed to northbound Interstate 75.

16. At approximately 5:52 p.m., Georgia State Police (GSP) officers initiated a traffic stop on POINDEXTER for traffic violations. At approximately 5:53 p.m., TARGET TELEPHONE #2 received an incoming telephone call from POINDEXTER. During the call, POINDEXTER stated, "Hey, they just pulled me over man. Bartow County man." Jerriod SIVELS replied, "For real?" POINDEXTER then stated, "Yeah, yeah man" and Jerriod SIVELS replied, "God damn." A subsequent probable cause search of POINDEXTER's vehicle resulted in the seizure of approximately eight kilograms of cocaine from a black gym bag located on the rear seat of the vehicle. POINDEXTER was subsequently arrested and transported to the Bartow

County jail. The cocaine was later field-tested and it tested positive for cocaine. The cocaine was subsequently sent to the DEA laboratory for testing and safekeeping and the results are pending. Based on your affiant's training, knowledge, and experience of this investigation, I believe that POINDEXTER picked up the eight kilograms of cocaine from the 838 Mildred Place NW, Atlanta, Georgia, while he was there with Jerriod SIVELS and Jamaal PARKER. Your Affiant further believes that SIVELS utilized DEVICE 1 to coordinate obtaining the cocaine seized from POINDEXTER.

17. On March 3, 2019, at approximately 12:50 a.m., Jerriod SIVELS was observed by law enforcement to arrive at the Parc 1346 Apartments located at 1346 Gunbarrel Road, Chattanooga, Tennessee. As Jerriod SIVELS approached the front gate to the apartment complex, DEA personnel approached and arrested Jerriod SIVELS. After Jerriod SIVELS' was removed from the vehicle, Task Force Officer (TFO) Rodd Watters recovered a loaded Taurus 9mm handgun (Serial number: TJW03422) from on top of the front driver's side seat. Also recovered were three cellular telephones: an Apple iPhone (TARGET TELEPHONE #2), a black Samsung cellular telephone (DEVICE 1), and a gold LG cellular telephone (DEVICE 2).

**Probable Cause Relating to DEVICE 2**

18. On December 17, 2018, Jamaal PARKER was arrested for failure to pay child support and was incarcerated in the Hamilton County, Tennessee jail between December 17, 2018, and December 20, 2018. PARKER was subsequently transferred to the Silverdale Correction Center in Chattanooga, Tennessee. Law enforcement was subsequently able to obtain and review calls made by Jamaal PARKER while he was incarcerated through the Hamilton County Jail Securus Phone System. The Hamilton County Jail Securus Phone System warns the parties to each call that their communications are subject to monitoring and recording.

19. On December 18, 2018, at approximately 1:52 p.m., Jamaal PARKER made an outgoing telephone call to DEVICE 2, utilized by Jerriod SIVELS. During the call, Jamaal PARKER stated, "I got to flip these joints." Jerriod SIVELS replied, "I got you brah," and "What I was fixing to say, you said I need to be look for a Bitlock dude with the shape up, Diaz. What about that nigga with the beard, that young nigga with the beard from over there east Chatt?" Jamaal PARKER responded, "Yeah from east Chatt." PARKER then asked, "Which other nigga?" and Jerriod SIVELS replied, "The nigga that drives the beamer brah." PARKER then stated, "Yeah, yeah, you know him for sure" and "Uh Ko." Jamaal PARKER and Jerriod SIVELS then discussed Jamaal PARKER's nephew and PARKER stated, "Nah, nah, nah, he's good, he's good, he got one." Later in the conversation Jerriod SIVELS stated, "I had to turn that damn room upside down dude." Jamaal PARKER replied, "Oh yeah." Jerriod SIVELS then stated, "Yeah, you a mother fucker." Jamaal PARKER, "You got that little bag." Jerriod SIVELS replied, "Shit, I tore that little motherfucker up. I think I did good." Jamaal PARKER then stated, "That bag in the closet." Jerriod SIVELS replied, "Yeah I know. I went through all that, I went through all that shit." Your Affiant believes that during this conversation, Jerriod SIVELS and Jamaal PARKER were discussing drug customers of theirs that Jerriod SIVELS needed to contact while Jamaal PARKER was incarcerated. Your Affiant further believes that Jerriod SIVELS told Jamaal PARKER that he went to his residence and recovered a bag of narcotics from the residence.

20. On February 6, 2019, Jerriod SIVELS utilized DEVICE 2 to call Antonio HICKMAN, but only half of the conversation was recorded due to a malfunction of the system. In this call HICKMAN replied to Jerriod SIVELS, "Uh, yeah. I can probably give you what I have left and then I'll just have to grab some when I go to this festival this next weekend," and

"Uh, I think I got like, maybe a, maybe a whole one. Probably I think. Not for sure maybe like 8, 7, some shit like that." Your Affiant believes Antonio HICKMAN is normally a customer of Jerriod SIVELS but in this call HICKMAN is telling the SIVELS that he has drugs and can bring them to the SIVELS because SIVELS was out of drugs.

21. On February 8, 2019, Jerriod SIVELS utilized DEVICE 2 to communicate with a customer via text message. The customer text Jerriod SIVELS and asked, "Wat it do family is it all good yet" and SIVELS responded, "Not yet." Your Affiant believes that this was a customer of Jerriod SIVELS wanting to know if SIVELS had drugs for sale yet and SIVELS responded that he did not yet.

**Probable Cause Relating to DEVICE 3**

22. On February 7, 2019, at approximately 6:48 p.m., TARGET TELEPHONE #2 received an incoming telephone call from Nathaniel WILKINS utilizing telephone number 470-390-2720. During the call, WILKINS stated, "I had texted your ass the other day and you didn't texted me back." And SIVELS responded, "Naw I got, shit my damn. I ain't got no minutes on my other little line," and "You ain't text this number?" WILKINS said, "Naw, I hit the other number," and SIVELS replied "Yeah, that's my, you know that's the little, the little...you already know. You feel me?" and "Yeah, I just be putting, I just talk to you on that mo fo boy, just throw that bitch back in the drawer, I don't even use it again till I need it. You feel me?" SIVELS later said, "Yeah, I was thinking about your ass, too. I'm gonna uhh....I got two shows this weekend. I got one in Alabama tomorrow and I got one in South Carolina Sunday. When I get done with that shit I'm going to come and see you." Your affiant believes based on his experience and knowledge that WILKINS is SIVELS' and PARKER's source of supply for cocaine. WILKINS and SIVELS were talking about another telephone (DEVICE 3) that

SIVELS uses just to talk to the source of supply and no one else but that is a pre-paid phone that is currently out of minutes. The source of supply was checking to see when SIVELS would be coming to buy more narcotics because the source of supply had not heard from SIVELS in the usual amount of time between drug re-supplies.

23. On March 3, 2019, law enforcement executed a federal search warrant at 3505 Hoyt Street, Chattanooga, Tennessee, a residence owned and utilized by Jerriod SIVELS. Subsequent to the execution of the search warrant, law enforcement seized suspected cocaine, suspected crack cocaine, guns, drug processing equipment, U.S. Currency, and two cellular telephones in a kitchen drawer (DEVICE 3 and another flip phone). SA William Wise reviewed pen register data for WILKINS' 470-390-2720 telephone number and located one telephone call with a 423 area code, which was 423-504-7384 (DEVICE 3), from February 15, 2019. On March 5, 2019, SA William Wise dialed the telephone number for DEVICE 3 and identified this seized telephone as DEVICE 3. Your affiant believes that DEVICE 3, which was recovered during a search warrant at 3505 Hoyt Street, Chattanooga, Tennessee, is the "other number" WILKINS is referring to above when he and Jerriod SIVELS are talking about texting and calling each other and was utilized by Jerriod SIVELS to communicate with WILKINS during the obtaining of the cocaine seized from POINDEXTER.

## TECHNICAL TERMS

24. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of

Page 11 of 17

Case 1:19-mj-00067-CHS   Document 2   Filed 04/04/19   Page 11 of 17   PageID #: 15

transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video,

or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

25. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I believe that the TARGET DEVICES have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. The TARGET DEVICES also have Internet capabilities. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

27. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how DEVICES 1, 2, and 3 were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the TARGET DEVICES because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose

Page 16 of 17

Case 1:19-mj-00067-CHS  Document 2  Filed 04/04/19  Page 16 of 17  PageID #: 20

many parts of the devices to human inspection in order to determine whether they are evidence described by the warrant.

29. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

30. I submit that this affidavit supports probable cause for search warrants authorizing the examination of TARGET DEVICES described in respective Attachments A to seek the items described in Attachment B.

_____
ANDREW BERGREN, DEA SPECIAL AGENT

Sworn to before me and signed in my presence
This __4th__ day of April, 2019.

_____
CHRISTOPHER H. STEGER
U.S. MAGISTRATE JUDGE